**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

_____
:
**SECURITIES AND EXCHANGE COMMISSION,**    :
:
**Plaintiff,**    :
:
**v.**    : No. 1:09-CV-361 (GMS)
:
**PAWEL P. DYNKOWSKI,**    : **JURY TRIAL DEMANDED**
**RICHARD A. BAILEY,**    :
**MATTHEW W. BROWN,**    :
**JACOB CANCELI,**    :
**GERARD J. D'AMARO,**    :
**GARY C. HEATH,**    :
**JOSEPH MANGIAPANE JR.,**    :
**NATHAN M. MICHAUD,**    :
**MARC J. RIVIELLO,**    :
**ADAM S. ROSENGARD, AND**    :
**FLORIAN R. TERNES,**    :
:
**Defendants.**    :
_____ :

**AMENDED COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges as

follows against the Defendants named above:

**SUMMARY OF CASE**

1.      This case is about a ring of serial penny stock manipulators.  In 2006 and

2007, Defendant Pawel Dynkowski engaged in fraudulent pump-and-dump schemes with

at least four separate stocks:  GH3 International, Inc. ("GH3"), Asia Global Holdings,

Inc. ("Asia Global"), Playstar Corp. ("Playstar"), and Xtreme Motorsports of California,

Inc. ("Xtreme Motorsports").  Each of the other Defendants in this case participated in

one or more of these frauds.  The fraudulent proceeds from these schemes totaled more

than $6.2 million.

2.      The pump-and-dump schemes generally followed the same pattern. Defendant Pawel Dynkowski and his accomplices agreed to sell large blocks of shares for penny stock companies (or "issuers") in exchange for a portion of the proceeds.  The issuers put these shares in nominee accounts that Dynkowski controlled.  Dynkowski and his accomplices then pumped the market price of the stocks through wash sales, matched orders, and other manipulative trading, to give the market the false impression that there was real demand for these securities.  They often timed this manipulative trading to coincide with false, misleading, and touting press releases from the issuers, which Dynkowski at times prepared himself.  After artificially inflating the price of the stocks, Dynkowski and his accomplices then sold the shares they obtained from the issuers to the unsuspecting market.  Dynkowski, his accomplices, and the issuers shared the illicit profits.

3.      The GH3 pump-and-dump scheme occurred between October and December 2006.  Dynkowski orchestrated this fraud with Defendant Matthew Brown, who operates a penny stock website called InvestorsHub.com.  Brown introduced Dynkowski to Defendant Richard Bailey, an officer of GH3, and to Defendant Jake Canceli, a penny stock promoter who participated in the scheme.  Brown acted as a liaison between Dynkowski, Canceli, Bailey and Defendant Florian Ternes, the CEO of GH3.  Dynkowski and his associates used wash sales, matched orders, and other manipulative trading, timed to coincide with false, misleading, and touting press releases arranged by Bailey and Ternes at the company, to artificially inflate the price of GH3 stock.  Canceli provided the accounts from which Dynkowski subsequently sold purportedly unrestricted shares received from the issuer through Defendant Gary Heath,

who Bailey and Ternes arranged to act as a conduit for the shares.  The scheme culminated in mid-December 2006, with Dynkowski dumping 312 million shares of GH3 stock for total proceeds of $747,609.

4.      Brown planned the Asia Global pump-and-dump scheme with Defendants Joseph Mangiapane and Marc Riviello, who were both registered representatives at a small broker-dealer in California.  Dynkowski and Defendant Nathan Michaud, who met through InvestorsHub.com, pumped the price of the stock using wash sales, matched orders, and other manipulative trading, coordinated with false, misleading, and touting press releases by the company.  The scheme occurred in three cycles:  August-September 2006, November-December 2006, and January-February 2007.  After manipulating the price of the stock, Dynkowski, Brown, Mangiapane, and Riviello dumped more than 54 million shares that had been improperly registered on SEC Form S-8 and held in nominee accounts.  The illicit proceeds from this scheme totaled at least $4,050,529.

5.      Dynkowski and Defendant Gerard D'Amaro carried out the Playstar pump-and-dump scheme.  The two of them met through InvestorsHub.com.  D'Amaro acted as the liaison with the issuer as well as the nominee account holder for the purportedly unrestricted shares received from the company.  In this scheme, which occurred during October and December 2006, Dynkowski pumped Playstar's stock through wash sales, matched orders, and other manipulative trading.  After artificially manipulating the market, Dynkowski and D'Amaro sold 11.5 million shares they received from the issuer for total illicit proceeds of $1,180,294.

6.      Dynkowski and Accomplice No. 1 ("AN1") carried out the Xtreme Motorsports pump-and-dump scheme.  The two of them, who met through InvestorsHub.com, pumped Xtreme Motorsports stock through wash sales, matched

orders, and other manipulative trading during January and February 2007.  Dynkowski's friend, Defendant Adam Rosengard, served as the nominee account holder who facilitated the dump of 13 million purportedly unrestricted shares of Xtreme Motorsports stock.  After pumping the stock, Dynkowski sold the shares from Rosengard's account generating illicit proceeds of $257,646.

7.      The foregoing conduct violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)], Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) & 78m(d)], and Rules 10b-5, 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2].

8.      The Commission seeks to have the Court enter judgments permanently enjoining Defendants from violating the securities laws, requiring the payment of disgorgement, plus prejudgment interest, and civil monetary penalties, and barring certain of the Defendants from participating in future penny stock offerings.

9.      Each of the Defendants will continue to violate the securities laws unless permanently restrained and enjoined from doing so.

## JURISDICTION

10.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

11.      The District of Delaware is a proper venue for this action because certain of the acts and transactions at issue in this action occurred in this District.  For example, Dynkowski engaged in substantial manipulative trading in the stock of GH3, Asia Global,

Playstar and Xtreme Motorsports using on-line brokerage accounts accessed from his residence in Newark, Delaware.

12.     Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportations and communications in interstate commerce, and the mails in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANTS

13.     Defendant **Pawel P. Dynkowski** is a citizen of Poland and a legal resident of the U.S.  During the relevant time period, Dynkowski resided in Newark, Delaware.

14.     Defendant **Richard A. Bailey** is a resident of Las Vegas, Nevada.  Bailey was the Secretary and the director of GH3 during the relevant time period.

15.     Defendant **Matthew W. Brown** is a resident of Aliso Viejo, California. Brown operates the penny stock website InvestorsHub.com.

16.     Defendant **Jacob Canceli** is a resident of Mission Viejo, California. Canceli is a stock promoter.

17.     Defendant **Gerard J. D'Amaro** is a resident of Pompano Beach, Florida. D'Amaro is a stock promoter.

18.     Defendant **Gary C. Heath** is a resident of Mesa, Arizona.  Heath owned and controlled High Plains Enterprises, a now inactive Minnesota corporation.

19.     Defendant **Joseph Mangiapane Jr.** is a resident of Laguna Niguel, California.  Mangiapane was a registered representative at AIS Financial, Inc. Mangiapane is the CEO of Rubicon Financial, Inc., which owned AIS Financial, Inc. during the relevant time period.

20.     Defendant **Nathan M. Michaud** is a resident of Boston, Massachusetts.

Michaud is an internet web site designer.

21.     Defendant **Marc J. Riviello** is a resident of Redwood City, California. Riviello was a registered representative at AIS Financial, Inc.

22.     Defendant **Adam S. Rosengard** is a resident of Voorhees, New Jersey. Rosengard was a student at the University of Delaware during the relevant time period.

23.     Defendant **Florian R. Ternes** is a resident of Las Vegas, Nevada.  Ternes was the CEO of GH3 during the relevant time period.

## OTHER RELEVANT ENTITIES

24.     GH3 International, Inc. ("GH3") was a Nevada company based in Las Vegas.  It purported to market anti-aging products sold under the name GeroVital H3, supposedly pursuant to a license from the government of Romania.  Its stock, which was not registered with the Commission, was quoted on the Pink Sheets.

25.     Asia Global Holdings, Inc. ("Asia Global") is a Nevada company purportedly operating in China with headquarters in Hong Kong.  Asia Global purports to be a media company with the rights to "Who Wants to be a Millionaire" in China.  Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)] and trades on the Over the Counter Bulletin Board.

26.     Playstar Corp. ("Playstar") (f/k/a Playstar Wyoming Holding Corp.) was an Antigua corporation with headquarters in Woodbridge, Ontario.  Playstar claimed to be a communications company.  During the relevant time period, Playstar's common stock was registered with the Commission under Exchange Act Section 12(g) [15 U.S.C. § 78l(g)] and was quoted on the Pink Sheets.  On June 3, 2008, the Commission revoked the registration of Playstar's stock pursuant to Exchange Act Section 12(j) [15 U.S.C. § 78l(j)].

27.     Xtreme Motorsports of California, Inc. ("Xtreme Motorsports") was a Nevada company with headquarters in Bakersfield, California.  Xtreme Motorsports claimed to produce "dunebuggies" and "sandcars."  Its stock, which was not registered with the Commission, was quoted on the Pink Sheets during the relevant time period.  On May 19, 2008, PinkSheets.com suspended quoting the company's stock.

28.     AIS Financial, Inc. (f/k/a Advantage Investment Strategies, Inc.) (hereinafter "AIS") is a registered broker-dealer located in Irvine, California.

29.     High Plains Enterprises was a Minnesota corporation owned and controlled by Gary Heath.  It is currently inactive.

30.     Market Solutions Limited, Inc. ("Market Solutions") is an entity owned by Defendant Gerard D'Amaro and located in Pompano Beach, Florida.

31.     W.S. Trading, Inc. ("W.S. Trading") is an entity owned by Defendant Gerard D'Amaro and located in Pompano Beach, Florida.

32.     Tetrix Financial is a Delaware corporation owned by Defendant Pawel Dynkowski.

## FACTS

### GH3 International, Inc.

33.     GH3 is a Nevada company that purports to market anti-aging products. The GH3 pump-and-dump scheme occurred in October-December 2006 and generated fraudulent proceeds of $747,609.  In late 2006, Brown, Dynkowski, and Canceli attended a meeting at the offices of AIS in California with Richard Bailey, the Secretary of GH3. Florian Ternes, the CEO of GH3, participated in the meeting by telephone.  Brown, Dynkowski, Canceli, Bailey, and Ternes planned the GH3 pump-and-dump scheme at this meeting.  They agreed that GH3 would issue company stock in 52 million share

increments to Canceli for $0.001 per share, with payment due after Dynkowski succeeded in inflating the market price of GH3 stock and selling those shares to unsuspecting investors.  Mangiapane, who managed the AIS office, agreed to allow the meeting to be held at AIS's office in exchange for a portion of the proceeds from the pump-and-dump scheme.

34.     Dynkowski inflated the market price of GH3 stock through manipulative trading timed to coincide with misleading and touting press releases.  Brown helped to coordinate the timing of this manipulative trading with the press releases, by serving as a liaison between Dynkowski and Canceli, who was in contact with Bailey and Ternes of GH3.  When the scheme began, GH3 traded for merely four-hundredths of a penny ($0.0004), but the efforts of Dynkowski, Brown and others in the scheme eventually propelled the stock's price to a high of 1.8 cents per share – a gain of more than 4,000 percent.

35.     Bailey and Ternes laid the groundwork for the scheme.  On October 30, 2006, they arranged for GH3 to execute a 1 for 20 reverse stock split that reduced the company's outstanding shares by 95%.  This move was important because, after the split, the millions of shares issued by the company for Dynkowski to sell later in the scheme represented the vast majority of the company's outstanding stock, and any sales by existing shareholders would have less impact on the stock's price.

36.     Between December 4 and 12, 2006, GH3 transferred 312 million company shares to accounts in Canceli's name at Spartan Securities Group and Bishop Rosen & Co.  Ternes, as GH3's CEO, instructed the transfer agent to issue the shares without restrictive legend to High Plains Enterprises, a Minnesota corporation owned and controlled by Gary Heath.  Ternes knew Heath from previous dealings.  Bailey and

37.     Under this arrangement, on six different occasions GH3 purportedly sold the shares to High Plains Enterprises, and that company then re-sold the shares to Canceli.  These offers and sales of securities were unregistered and not subject to a valid exemption from registration.  They were sham transactions intended to evade registration requirements.  Everyone involved in these transactions, including Bailey, Canceli, Heath, and Ternes, intended for the shares to be sold into the public market as soon as possible (as they in fact were).

38.     Starting on December 4, and continuing through December 13, 2006, Dynkowski and others, such as Brown, engaged in manipulative trading of GH3 stock, including using wash sales and matched orders to inflate its price.

39.     Dynkowski engaged in wash trading between his own accounts and multiple nominee accounts held in the names of his father, Tetrix Financial (a company Dynkowski owns), and Canceli.  Dynkowski also traded matched orders with Brown. These wash sales and matched orders involved hundreds of millions of shares of GH3.

40.     This manipulative trading artificially inflated the price of GH3's stock and made it appear to investors that GH3's stock was much more liquid than it really was.  As unsuspecting buyers were attracted to GH3 in increasing numbers, the stock's volume and ultimately its price continued to increase.

41.     Dynkowski timed his manipulative trading to coincide with touting press releases from the company.  At the initial meeting when the GH3 pump-and-dump was planned, Bailey had promised to "provide news" as part of the scheme.  Through Canceli, Bailey and Ternes coordinated company press releases with Dynkowski and Brown.

42.     On December 7, 2006, GH3 issued a press release stating that its 2005

revenues exceeded $2.1 million.  The next day, December 8, GH3 issued a second press
release stating that its revenues for 2006 exceeded $3 million.  Dynkowski timed his
manipulative trading with these press releases, and the volume and price of GH3 stock
soared.  On December 7, for example, the volume of trading in GH3's stock increased
over 600% from the prior day, and the price of the stock jumped more than 150% (from
0.7 cents to 1.8 cents).  Bailey and Ternes knew, or were reckless in not knowing, that the
revenue figures reported in these press releases were false or misleading.

43.     Dynkowski began dumping the shares received from the issuer on
December 7 and continued selling for the next several days.  Although Dynkowski was
not listed as an authorized trader on Canceli's accounts, he placed sell orders directly
with Canceli's brokers at Bishop Rosen and Spartan Securities.  Between December 7
and December 13, 2006, Dynkowski and Canceli sold all 312 million shares they
received from the issuer, generating proceeds of $747,609.

44.     In order to keep the price of the stock up while selling these shares,
Dynkowski continued to engage in manipulative trading, and the company issued
additional press releases.  Indeed, at one point, Dynkowski instructed Brown to have the
company issue a press release stating that the company had ordered a non-objecting
beneficial owners ("NOBO") list from its transfer agent.  The purpose of the "NOBO
press release" was to mislead investors into believing that the massive selling of GH3
stock (for which Dynkowski was responsible) was attributable to short sellers.  GH3
issued the misleading NOBO press release on December 8, 2006, just as Dynkowski was
dumping the shares from Canceli's accounts.

45.     Brown, Canceli, Dynkowski, Mangiapane, Riviello, Heath, and GH3 (or
its officers Bailey and Ternes) divided the illicit proceeds from the scheme.  Brown,

Mangiapane, and Riviello laundered a substantial portion of the money in order to pay Dynkowski.

46.     After Dynkowski finished selling the 312 million shares that Canceli obtained from GH3, Bailey and Ternes continued making additional unregistered offers and sales of GH3 stock (that were not subject to a valid exemption from registration) through Gary Heath and entities that he owned or controlled.  Bailey and Ternes authorized the transfer of an additional 988 million shares to Heath and his entities, and he sold the bulk of these securities for a few thousandths of a penny per share, realizing approximately an additional $272,000 in proceeds.  Heath gave approximately $130,000 of this money to GH3 and kept the rest for himself.

### Asia Global Holdings, Inc.

47.     Matt Brown, Joseph Mangiapane, and Marc Riviello planned the Asia Global pump-and-dump scheme in August 2006 with a representative of Asia Global. They used Dynkowski, whom Brown knew from InvestorsHub.com, to conduct the manipulative trading.

48.     In this scheme, as with GH3, Dynkowski and his associates pumped the price of Asia Global's stock through manipulative trading and misleading or touting press releases.  Mangiapane and Riviello used their positions as registered representatives at AIS to open a series of nominee accounts for this scheme. Dynkowski and Brown used these nominee accounts to sell millions of shares obtained from the issuer which were purportedly registered on Form S-8.  The purpose of Form S-8 (a short form registration statement) is to register an offering of securities by an issuer under an "employee benefit plan."  The shares issued in this pump-and-dump scheme did not qualify for registration on Form S-8.  Accordingly, this was an unregistered offer and sale of securities that was

not subject to a valid exemption from registration.

49.     This pump-and-dump scheme occurred in three cycles:  August-September 2006, November-December 2006, and January-February 2007.  The total proceeds of the fraud were $4,050,529.

50.     Defendant Nathan Michaud, a trader whom Dynkowski had previously met through InvestorsHub.com, also participated in this scheme.  In August and September 2006, Dynkowski and Michaud, as well as others, engaged in wash sales, matched orders, and other manipulative trading to generate phony volume and artificially inflate Asia Global's stock price.  When the scheme began, Asia Global traded for approximately 11 cents per share.  Starting on August 9, 2006, Dynkowski and Michaud began to pump the stock using wash sales, matched orders, and other manipulative trading.  Dynkowski and Michaud continued their manipulative trading through the end of September 2006.

51.     This manipulative trading artificially inflated Asia Global's stock price. In the space of thirteen trading days, the price of Asia Global's stock rose from 11.5 cents per share at the close of the market on August 9, 2006, to an intraday high of 41 cents per share on August 25, 2006.  Asia Global's daily volume likewise jumped by millions of shares per day during this period.

52.     In the midst of the steep climb in its stock price, Asia Global directed its transfer agent on August 21, 2006 to transfer 7.75 million shares purportedly registered on Form S-8 into the nominee accounts at AIS.  These 7.75 million shares represented approximately 25% of Asia Global's issued and outstanding shares.  Brown and Dynkowski controlled the subsequent sale of these shares by giving sell orders to Mangiapane and Riviello, registered representatives at AIS who knew (or were reckless

in not knowing) that these sales were the dump phase of the scheme.  Between August 30 and September 5, 2006, they sold 7.75 million shares from the nominee accounts at AIS, resulting in illicit profits of $1,331,118.

53.     While Dynkowski and Brown were selling shares from the nominee accounts, Dynkowski instructed Brown on August 24, 2006 to have Asia Global issue a press release hyping the company's second quarter 2006 financial results.  Dynkowski told Brown to "make it sound good… like AAGH [Asia Global] announces record revenue net profits [sic]" and suggested that the press release state that the company's profits had increased by at least 300%.  Dynkowski urged Brown to "make it sound ENORMOUS."  On September 1, 2006, two days after Dynkowski and Brown began selling the 7.75 million shares in the nominee accounts, Asia Global issued a press release claiming that its net income for the second quarter of 2006 had increased by 370% compared to its net income in the second quarter of 2005 and that its profits for July 2006 were 745% greater than its profits for July 2005.  Dynkowski timed his manipulative trading to coincide with the publication of this press release.

54.     The Defendants repeated this scheme with Asia Global in November and December 2006.  On October 27, 2006, the company filed another Form S-8 with the Commission.  Asia Global thereafter had its transfer agent issue another 25 million shares to most of the same nominee accounts at AIS that were used in the prior round.  Again, this was an improper use of a Form S-8.  These 25 million shares represented 45% of Asia Global's issued and outstanding shares at the time.

55.     In this second cycle of the scheme, Dynkowski again began a manipulative trading campaign using wash sales, matched orders, and other manipulative trading.

56.     As in the prior pumps, Dynkowski timed the manipulative trading to coincide with company press releases.  He personally wrote press releases for Asia Global during this cycle, including the "Shareholder Update" issued on November 8, 2006.  That press release used the same misleading NOBO tactic that Dynkowski used for GH3 one month later, and it also claimed that "July 2006 profits were up 745% over the previous years [sic] July profits."  After manipulating the price of the stock, Dynkowski and Brown, through orders submitted to Mangiapane and Riviello, sold the 25 million shares held in the AIS nominee accounts at an average price of about $0.056 per share in November and December 2006.  These sales yielded illicit proceeds of $1,485,704.

57.     The final cycle of the scheme took place in January and February 2007. On January 31, 2006, Asia Global filed another Form S-8 for 30 million shares.  That same day, Asia Global requested that its transfer agent issue 26,500,000 of these shares to largely the same group of nominee accounts at AIS as in the previous two rounds.  These transfers, which represented approximately 32.5% of Asia Global's issued and outstanding shares, constituted an improper use of Form S-8.

58.     On January 16, 2007, when Asia Global's stock opened at $0.06 per share, Dynkowski and his associates began to manipulate the stock.  They matched orders and executed wash sales in order to artificially inflate the stock's price.  By the end of January 2007, Asia Global's stock price had more than doubled (with an intraday high of $0.152 on January 23, 2007).

59.     Additionally, on February 6, 2007, Asia Global issued a press release claiming that its subsidiary had just received a license to produce 104 episodes of "Who Wants to Be a Millionaire" in China.  The volume of trading in Asia Global on February

6 increased by more than 65%.  That day alone Dynkowski and Brown, through orders submitted to Mangiapane and Riviello, were able to sell approximately 5.5 million shares held in nominee accounts, representing approximately 25% of the total volume that day.

60.     From February 2 through February 8, Dynkowski and Brown, through orders submitted to Mangiapane and Riviello, sold approximately 24.5 million shares held in the nominee accounts, making illicit profits of $1,233,707.

61.     Brown, Dynkowski, Mangiapane, Michaud, Riviello, and Asia Global (or its representatives) divided the $4 million in illicit proceeds from the scheme.

### Playstar Corp.

62.     The Playstar scheme occurred between October and December 2006 and generated approximately $1,180,294 in illicit profits.  Defendant Gerard D'Amaro participated in this scheme with Dynkowski and served as the liaison with the CEO of Playstar.  D'Amaro also provided the nominee accounts from which Dynkowski dumped Playstar shares provided by the company.

63.     Starting on October 19, 2006, Dynkowski and others began inflating the price of Playstar stock through manipulative trading, including using wash sales and matched orders accounting for millions of shares in volume.  This manipulative trading artificially inflated the company's stock price.

64.     D'Amaro arranged with Playstar's CEO to have the company issue numerous touting or misleading press releases between November 8 and December 20, 2006, which coincided with Dynkowski's manipulative trading and helped further boost the price of the company's stock.  Indeed, on November 10, 2006, Playstar used the same misleading NOBO press release tactic that Dynkowski had used days earlier for Asia Global and one month later for GH3.  Playstar's NOBO press release misleadingly

suggested that "naked short selling" was responsible for an unexplained "large short position" in its stock.  In reality, the alleged naked short selling was actually Dynkowski dumping the shares he had received from Playstar.

65.     The scheme was successful at dramatically raising Playstar's stock price. On October 18, 2006, the day before Dynkowski and his associates began pumping the stock, it closed at half a penny per share.  By November 9, 2006, the stock closed at 12 cents per share, an increase of 2,300%.

66.     Between October 18 and December 19, 2006, Playstar arranged for more than 39.6 million shares to be transferred to two accounts that D'Amaro set up at Spartan Securities in the names of Market Solutions and W.S. Trading, entities that D'Amaro owns.  At the direction of the company, the transfer agent issued these shares without restrictive legend.  These offers and sales of securities were unregistered and not subject to a valid exemption from registration.

67.     Dynkowski and D'Amaro controlled the sales from these accounts at Spartan Securities.  Although Dynkowski is not listed as an authorized trader on the accounts, he placed the majority of the orders for Playstar stock in the Market Solutions and W.S. Trading accounts.  Dynkowski and D'Amaro sold the shares from Playstar in three waves, the first on October 19, 23-27, and 31, 2006, the second on November 15, 16, and 17, 2006, and the third on December 11, 14, 15, 18 and 20, 2006.  In total, Dynkowski and D'Amaro sold more than 39.6 million shares of Playstar for a profit of $1,180,294.  Dynkowski and D'Amaro divided the illicit gains from this scheme between themselves and Playstar or its representatives.

### Xtreme Motorsports Of California, Inc.

68.     Dynkowski worked with Accomplice No. 1 ("AN1"), whom he met through InvestorsHub.com, to pump and then dump the stock of Xtreme Motorsports in January and February 2007.  To artificially inflate the price of the stock, Dynkowski and AN1 engaged in manipulative trading, including wash sales and matched orders.

69.     Through this manipulative trading, Dynkowski and AN1 boosted the price of the stock from 0.85 cents on February 2, 2007, to a high of 4.1 cents on February 7, 2007 (more than a 380% price increase in a few days).

70.     The dump began on February 7, 2007.  Prior to this date, Xtreme Motorsports authorized its transfer agent to issue 120 million shares without restrictive legend to a certain private company ("the Nominee Company").  The transfer agent did not issue the shares to the Nominee Company, however, and instead issued them to ten other individuals and entities that the Nominee Company designated.  This offer and sale of securities was unregistered and not subject to a valid exemption from registration.

71.     Defendant Adam Rosengard received 13 million shares of Xtreme Motorsports stock as one of these designees, even though he had no contact with the Nominee Company.  Dynkowski arranged for the shares to be issued to Rosengard, who gave Dynkowski electronic access to his brokerage account.  Dynkowski sold these shares on February 7, 2007, generating illicit profits of $257,646.  Rosengard sent the money to his personal bank account via a series of wire transfers between February 12 and May 7, 2007.  Rosengard withdrew most of this money in small increments of cash, kept a small amount for himself, and gave the rest to Dynkowski.

## **FIRST CLAIM**

### **Violations of Section 17(a) of the Securities Act**

**(Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro,
Mangiapane, Michaud, Riviello, and Ternes)**

72.     Paragraphs 1 – 71 are hereby incorporated by reference.

73.     Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Mangiapane, Michaud, Riviello, and Ternes knowingly or recklessly, directly or indirectly, in the offer and sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or by the use of the mails:

> a.   employed devices, schemes or artifices to defraud;
>
> b.   obtained money or property by means of any untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; and/or
>
> c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

74.     By engaging in the foregoing conduct, Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Mangiapane, Michaud, Riviello, and Ternes violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

**(Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Mangiapane, Michaud, Riviello, and Ternes)**

75.    Paragraphs 1 – 74 are hereby incorporated by reference.

76.    Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Mangiapane, Michaud, Riviello, and Ternes  knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange:

a.  employed devices, schemes or artifices to defraud;

b.  made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; and/or

c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

77.    By engaging in the foregoing conduct, Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Mangiapane, Michaud, Riviello, and Ternes violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## THIRD CLAIM

### Violations of Sections 5(a) and (c) of the Securities Act

**(Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Heath, Mangiapane, Riviello, Rosengard, and Ternes)**

78.     Paragraphs 1 – 77 are hereby incorporated by reference.

79.     As described above, Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Heath, Mangiapane, Riviello, Rosengard, and Ternes directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) without a registration statement in effect as to the securities, sold such securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried such securities for the purpose of sale or for delivery after sale; or (b) offered to sell or offered to buy through the use or medium of a prospectus or otherwise securities as to which a registration statement had not been filed.

80.     By engaging in the conduct described above, Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Heath, Mangiapane, Riviello, Rosengard, and Ternes violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

## FOURTH CLAIM

### Violations of Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 Thereunder

**(Defendants Dynkowski and Brown)**

81.     Paragraphs 1 – 80 are hereby incorporated by reference.

82.     The common stock of Asia Global at all relevant times was registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l].

83.     Pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and

Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2], persons who are directly or indirectly the beneficial owners of more than five percent of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date in which their ownership exceeds five percent and to notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership by filing an amended Schedule 13D. The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding or disposing of securities of an issuer.

84.    As described above, Defendants Brown and Dynkowski at all relevant times acted as a group, for purposes of Exchange Act Section 13(d) and the Schedule 13D filing requirement, in acquiring, beneficially owning, and then disposing of more than five percent of Asia Global's common stock. Brown and Dynkowski together beneficially owned all of the Asia Global shares held in nominee accounts at AIS because they each had the power to dispose of these shares.

85.    Accordingly, Brown and Dynkowski were each under an obligation to file with the Commission true and accurate reports with respect to their ownership and subsequent sales of the Asia Global shares, pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2]. Neither Brown nor Dynkowski did so.

86.    By reason of the foregoing, Defendants Brown and Dynkowski violated, and unless restrained and enjoined will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

a) permanently enjoin Defendants Dynkowski and Brown from engaging in future conduct in violation of Exchange Act Sections 10(b) and 13(d) [15 U.S.C. §§ 78j(b) & 78m(d)], Rules 10b-5, 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2], and Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)];

b) permanently enjoin Defendants Bailey, Canceli, D'Amaro, Mangiapane, Riviello, and Ternes from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)];

c) permanently enjoin Defendant Michaud from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

d) permanently enjoin Defendants Heath and Rosengard from engaging in future conduct in violation of Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) & (c)];

e) order Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Mangiapane, Riviello, and Ternes to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

f) order Defendant Michaud to pay civil penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

g) order Defendants Heath and Rosengard to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

h) order Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, Heath, Mangiapane, Michaud, Riviello, Rosengard, and Ternes to disgorge, with prejudgment interest, any ill-gotten gains and provide an accounting of monies they received;

i) prohibit Defendants Dynkowski, Bailey, Brown, Canceli, D'Amaro, and Ternes from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

      j)  prohibit Defendants Heath and Rosengard from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)]; and

      k)  grant such other relief as this Court may deem just and proper.

Dated:  December 14, 2009             Respectfully submitted,


                                  /s Paul W. Kisslinger

DAVID C. WEISS                 Paul W. Kisslinger
UNITED STATES ATTORNEY     Frederick L. Block
                                  Robert B. Kaplan
By:  Seth Beausang, D.E. I.D. No. 4071   Brian O. Quinn
Assistant U.S. Attorney          Antony Richard Petrilla
U.S. Attorney's Office
District of Delaware             Attorneys for Plaintiff
1007 N. Orange Street           U.S. Securities and Exchange Commission
Wilmington, D.E.  19801         100 F Street, N.E.
                                  Washington, D.C.  20549
                                  202-551-4427 (tel) (Kisslinger)
                                  202-772-9246 (fax) (Kisslinger)